**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4150-14T4

IN THE MATTER OF DURAND GILYARD,
GARDEN STATE YOUTH CORRECTIONAL
FACILITY, DEPARTMENT OF CORRECTIONS.

_____

Telephonically argued January 18, 2017 –
Decided March 10, 2017

Before Judges Lihotz, Hoffman and O'Connor.

On appeal from the Civil Service Commission,
Docket No. 2015-2515.

Patricia B. Quelch argued the cause for
appellant Durand Gilyard (Helmer, Conley &
Kasselman, P.A., attorneys; Ms. Quelch, of
counsel and on the brief).

Anthony DiLello, Deputy Attorney General,
argued the cause for respondent Department of
Corrections (Christopher S. Porrino, Attorney
General, attorney; Melissa H. Raksa, Assistant
Attorney General, of counsel; Mr. DiLello, on
the brief).

PER CURIAM

Appellant Durand Gilyard, a former corrections officer

assigned to the Garden State Youth Correctional Facility (Garden

State), appeals from the final decision issued by the Civil Service

Commission (Commission), upholding his termination from employment based upon conduct unbecoming of a public employee and commission of other prohibited acts. The Commission adopted the findings and conclusions issued by an administrative law judge (ALJ) following an evidentiary hearing. On appeal, appellant maintains the Commission's determination was arbitrary and capricious because his actions fell within his assigned duties and any procedural lapses in performance did not warrant termination. We are not persuaded and affirm.

The facts recited are found in the administrative hearing record and are undisputed. Appellant worked as the housing officer in Garden State's therapeutic community unit, which houses inmates needing counseling for drug and alcohol addiction. Appellant worked the second shift, from 2 p.m. to 10 p.m.

Shortly after 8:30 p.m. on November 6, 2013, he commenced searching cells for contraband. Appellant directed his effort to verifying the ownership of televisions and radios located in each cell. He was concerned there were continuing problems with some inmates extorting items from others. He testified: "So I go check the back of the TVs and look for a name at first. If this name doesn't match the inmate in the room, then I'll ask them for paperwork." The first several inmates failed to produce the documents verifying ownership of the electronics. As a result,

appellant confiscated those televisions and every other television and radio in the unit. Because his initial inspections could not verify ownership, he assumed there was a systemic problem and confiscated fifty televisions and fifteen radios. Appellant placed the confiscated electronics in an adjacent housing unit's storage closet because his unit's storage closets were full.

Although appellant made a list of items removed from each cell, he did not "have time" to complete the paperwork required by the Department of Corrections (DOC) regulations addressing seizure of contraband. Appellant admitted he did not follow the correctional facility's policy, stating:

> So at that time to write that many forms at that late at night, I knew it was going to take me over the ten o'clock limit. There's no way I could a [sic] write confiscation sheets for 65 items. It would have took [sic] me another hour or two to do that. I felt at that time it wasn't an emergent situation only because I didn't have any problem with the inmates or they didn't give me a disturbance [sic].

Appellant knew the requisite procedures set forth in the confiscation regulations included the requirement to charge each offending inmate with improperly possessing the television or radio and to give each a receipt for the confiscated item. When he asked inmates if they wanted paperwork, according to appellant, the inmates said no. He admitted:

> The only reason why I didn't 'cause I had not determined that every item, or whose item did belong to who, who would rightfully theirs, who's wasn't [sic]. I was kind of in the middle of my investigation. And I didn't want to write [c]onfiscation sheets or [c]harges at that time without willingly knowing whose items rightfully did belong to theirs [sic]. So I figured, as far as myself[,] a judgment call[,] I'll wait till tomorrow. They're secured in the closets. Get to the bottom of it the next day.

Two officers working the next morning testified there was no unusual behavior by the inmates as they moved from their cells to the gym for counseling. However, Ira Crespi and his supervisor, Jennifer Penninpede-Fiore, who facilitated substance and behavioral counseling programs for Garden State, also testified. Each testified as to events witnessed during the inmates' group session, the morning after appellant's confiscations. Ninety-six inmates were present for counseling with Crespi and another fifty-two were in the same gym attending a different session. Crespi explained it as "a day that I'd never experienced before," when "the inmates were disorderly, agitated, irritated, angry." The inmates ignored his customary instruction to sit down, and he heard various inmates discussing the events of the previous night. They were unsettled because their televisions and radios were confiscated. Some inmates stated, "We're going to protest this."

Crespi testified, "I really thought something bad might have happened" because the inmates were "pretty upset, very upset and I feared for my safety." Crespi contacted Penninpede-Fiore for help. When she arrived, accompanied by Sergeant Craig James, who requested assistance from Lieutenant Brian Hodgson, Penninpede-Fiore observed "the inmates were not designated to their area. They were all over. They were all standing. It was loud. It was chaotic." Penninpede-Fiore and Sergeant James walked to the different groups of inmates and asked them to sit down. She believed they complied because of Sergeant James' presence.

When appellant returned to work on November 7, 2013, his supervisor informed him an investigation of his actions was underway. Sergeant James undertook this investigation of the inmate's claims and found the fifty televisions and fifteen radios in the adjacent unit's storage area. He returned forty-three televisions and twelve radios, which were improperly seized from inmates who rightfully owned them.

Lieutenant John Henderson, one of the second shift area supervisors, testified appellant's actions constituted an unusual event requiring his supervisor's approval. He confirmed the mass confiscation was not authorized by appellant's supervisor, was not recorded on an incident report as required, was not listed in the

requisite log books, and was not mentioned to his supervisor or officers resuming duty on the next shift.

On December 19, 2013, Garden State issued a Preliminary Notice of Disciplinary Action to appellant. The notice listed these events as warranting discipline:

> On November 7, 2013[,] it was discovered that on November 6, 2013[,] you confiscated approximately fifty inmate televisions and fifteen radios without notifying your area supervisor, without completing the required paperwork, and with no written account of your actions. You then stored the confiscated items in a storage closet on the adjoining housing unit. This was done during the time that a code 33 was in effect. This action caused a disturbance during the TC counseling program on November 7, 2013[, which] may have caused injury to staff and destruction of state property.

Appellant was suspended pending a Loudermill[1] hearing for conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6), and other sufficient causes, N.J.A.C. 4A:2-2.3(a)(12), which included noncompliance with N.J.A.C. 10A:3-6.1, regulations delineating procedures for handling contraband.[2] Further, the notice advised

---

[1] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (holding due process requires a pretermination hearing to address charges affecting certain civil servants' property interests in employment).

[2] The notice also identified specific violations of the DOC Human Resources Bulletin 84-17 (Bulletin 84-17), including: a serious mistake due to carelessness that may result in danger or

A-4150-14T4

Garden State sought to terminate appellant's employment. The preliminary hearing was conducted, even though appellant was absent. Garden State suspended appellant without pay and served a Final Notice of Major Disciplinary Action to remove appellant from his employment. Following that hearing, appellant's employment was terminated.

Appellant appealed, and the matter was assigned to the Office of Administrative Law for evidentiary review as a contested case. Appellant and Garden State each presented witness testimony, along with documentary evidence. Following a four-day hearing, the ALJ issued a recommendation, concluding appellant committed all charges, and upheld his termination. The Commission adopted the ALJ's findings and accepted his conclusions as its final decision. This appeal followed.

A "strong presumption of reasonableness attaches to the actions of administrative agencies." In re Carroll, 339 N.J. Super. 429, 437 (App. Div.) (citation omitted), certif. denied, 170 N.J. 85 (2001). Although we undertake an independent review,

> [o]ur role in reviewing a final administrative
> agency decision is limited. In re Taylor, 158
> N.J. 644, 656 (1999). We must defer to a

---

injury to persons or property (§ B.8); conduct unbecoming an employee (§ C.11); violation of administrative procedures or regulations involving safety and security (§ D.7); and violation of a rule, regulation, policy, procedure, or administrative decision (§ E.1).

final agency decision unless it is arbitrary, capricious, unsupported by substantial credible evidence in the record, or in violation of the express or implicit legislative policy. Id. at 656-57. We must determine whether an agency's findings could have been "'reached on sufficient credible evidence present in the record' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Id. at 656 (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). If we find sufficient credible evidence in the record to support the agency's conclusions, then we must affirm even if we would have reached a different result. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988).

[In re Frazier, 435 N.J. Super. 1, 6 (App. Div. 2014).]

A party challenging the administrative action bears the burden to establish the agency did not follow the law; its decision was arbitrary, capricious, or unreasonable; or its decision was unsupported by substantial credible evidence in the record. In re Virtua-West Jersey Hosp. Voorhees, 194 N.J. 413, 422 (2008); see also Twp. Pharmacy v. Div. of Med. Assistance and Health Servs., 432 N.J. Super. 273, 283-84 (App. Div. 2013). If the record meets this standard, this court will set aside an agency decision, which is clearly mistaken or erroneous. L.M. v. Div. of Med. Assistance & Health Servs., 140 N.J. 480, 490 (1995).

However, an agency's interpretation of a statute or any legal determination is not accorded the same deference. Legal issues are reviewed de novo.

Appellant challenged the factual findings adopted by the Commission, arguing the proofs did not support the conclusion his conduct constituted the acts charged. Admitting he seized the inmates' electronics, he nevertheless refutes any notion his actions were deliberate or inappropriate or his decision regarding the seized items' storage left them open to theft. Finally, he challenges Crespi's comments as an overreaction and argues the resultant disquiet of the inmates during their morning counseling was not akin to a riot.

Public employee rights and duties are governed by the Civil Service Act, N.J.S.A. 11A:1-1 to -12.6. A public employee protected by the provisions of that Act may be subject to major discipline for a wide variety of offenses connected to his or her employment and the general causes for such discipline are set forth in N.J.A.C. 4A:2-2.3(a), which provides, in pertinent part:

> (a) An employee may be subject to discipline for:
>
> . . . .
>
> 6. Conduct unbecoming a public employee;
>
> . . . .

12. Other sufficient cause.

"Conduct unbecoming a public employee," N.J.A.C. 4A:2-2.3(a)(6), is an "elastic" phrase encompassing "any conduct which adversely affects . . . morale or efficiency [or] which has a tendency to destroy public respect for [public] employees and confidence in the operation of [public] services." Karins v. City of Atl. City, 152 N.J. 532, 554 (1998) (citations omitted). Conduct that "has the tendency to destroy public respect for [public] employees and public confidence in the operation of" the public entity is intolerable. Id. at 557.

Appellant's status as a corrections officer subjects him to a higher standard of conduct than ordinary public employees. In re Phillips, 117 N.J. 567, 576-77 (1990). This results because corrections officers represent "law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public." Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965), certif. denied, 47 N.J. 80 (1966).

Appellant has also been charged with violating N.J.A.C. 4A:2-2.3(a)(12), "Other sufficient cause." Although general, this provision applies to conduct that violates the implicit standard of good behavior that devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct.

As noted above, Garden State cited four provisions of Bulletin 84-17 as constituting the basis for this charge.

DOC regulations govern the procedure followed when a corrections officer seizes contraband. These include: the officer must give the inmate a receipt for the seized item, N.J.A.C. 10A:3-6.1(a)(3); before the officer's shift ends, the officer must give the contraband to his supervising officer along with a record of its chain of possession, N.J.A.C. 10A:3-6.1(a)(1) to (2); and the supervising officer must store the contraband with the Special Investigations Division or the correctional facility's Central Control, N.J.A.C. 10A:3-6.1(c).

The record supports appellant's failure to comply with the designated process. We reject, as specious, his claim taking the televisions and radios was "a valid exercise of discretion" and not a seizure of contraband. R. 2:11-3(e)(1)(E).

Appellant suggests his investigation was not completed because his shift ended, he had not cited any inmate, and fully intended to inform his supervisor when he concluded his review. Further, he did not believe it necessary to make any record in the log books prior to completing the investigation. Ironically, appellant asserts an inmate's possession of electronics is permitted but "protocol must be followed," while suggesting his decisions were acceptable practice even if "his actions may not

11

have comported with the official procedures or protocols . . . ." Appellant also justifies his actions, noting no disruption occurred that evening. We reject each of his suggestions.

The facts adopted by the Commission were as follows:

> [A]ppellant's action was a serious mistake as the improper confiscation of so many items created a hostile environment[,] which led to a mass inmate protest. . . . [T]hat appellant's conduct was unbecoming to a public employee since that conduct amounted to inappropriately taking personal property from the inmates and putting that property in and unsecured location subject to theft. . . . [A]ppellant violated the facility procedures and in doing so created a situation where safety of inmates, corrections personnel and civilians was put at risk because of the mass confiscation of electronics initiated by . . . appellant created a hostile environment and large inmate unrest.

Appellant's actions of appropriating all televisions and radios of every inmate in his unit, without determining if they were contraband, is neither authorized nor permitted. Strict compliance with the process and procedures created to address this issue is required to protect the safety and security of the institution, as well as to protect inmates' property rights. Importantly, appellant did not advise supervisors or other shift officers of his actions, denying them the opportunity to prepare for resultant unrest.

Appellant's challenge to the factual findings because the record contains no proof the taken electronics were unsecured begs the question. The inmate property was taken and placed outside the unit, without compliance with policies or procedures required by the facility. We also reject appellant's reliance on testimony offered by other corrections officers, which minimized the event and appellant's actions. As Lieutenant Henderson explained, the therapeutic counseling unit inmates are more volatile than those in other units because of the circumstances they face. Further, the agitated and angry group counseling session could have escalated into a riot had the morning personnel not acted as "phenomenally" as they had.

Maintenance of strict discipline is important in military-like settings such as prisons and correctional facilities. Rivell v. Civil Serv. Comm'n, 115 N.J. Super. 64, 72 (App. Div.), certif. denied, 59 N.J. 269 (1971). Thus, strict adherence to procedures developed and published by the DOC is necessary to maintain control. This court has underscored:

> The need for proper control over the conduct of inmates in a correctional facility and the part played by proper relationships between those who are required to maintain order and enforce discipline and the inmates cannot be doubted. We can take judicial notice that such facilities, if not properly operated, have a capacity to become "tinderboxes."

[Bowden v. Bayside State Prison, 268 N.J. Super. 301, 305-06 (App. Div. 1993), certif. denied, 135 N.J. 469 (1994).]

We conclude appellant's factual challenges lack merit. R. 2:3-11(e)(1)(E). His actions were not justified or acceptable, but rather adversely affected the morale and efficiency of the correctional facility and had the "tendency to destroy public respect for [public] employees and public confidence in the operation of" the correctional facility. Karins, supra, 152 N.J. at 557. The Commission's findings that appellant's conduct violated N.J.A.C. 4A:2-2.3 (a)(6) and (12), along with the policies adopted in Bulletin 87-17, are amply supported by the record evidence.

Next, appellant argues the Commission erred because his termination was not warranted by the disciplinary infractions. We disagree.

"A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007) (citations omitted)). This court has no authority to act independently, particularly regarding an issue directed to the agency's special "expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). This deferential standard applies to our

review of a challenge to an issued disciplinary sanction. Ibid. "Accordingly, when reviewing administrative sanctions, appellate courts should consider whether the 'punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness.'" Stallworth, supra, 208 N.J. at 195 (quoting Carter, supra, 191 N.J. at 484).

Appellant's argument suggests he was "just doing his job," and the infraction he committed was merely not completing paperwork. He also points to the limited disciplinary sanction issued to his co-employee who assisted him in the confiscation and storage of the electronics. These contentions completely ignore the facts.

No emergency resulted because some inmates possibly possessed a television or radio that was not documented as his own. While such an instance required the inmate to be cited for possession of contraband, no danger was posed by allowing possession to continue, pending appellant's strict compliance with requisite procedures. In contrast, the mass seizure of all electronics without regard to rightful proof of possession, on the hunch some of the items may qualify as contraband, is neither warranted nor sanctioned. The resultant unrest and protest, when inmates gathered and discussed appellant's misguided attempt to enforce

15

television and radio protocol, posed a significant security and safety risk, which could have been catastrophic.

Appellant's argument that the sanction of termination deviated from the expectations of progressive discipline is also rejected. A single egregious act may justify termination. See Stallworth, supra, 208 N.J. at 196. "[P]rogressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." In re Herrmann, supra, 192 N.J. at 33.

In its review, the Commission's adopted factual findings noted appellant's prior record, which included a 2009 disciplinary sanction and 120-day suspension when he failed to secure cell doors, allowing one inmate to enter another's cell and commit an assault. However, that offense was not weighed in meting appellant's sanction because the present offenses were determined sufficiently egregious to warrant termination. The Commission reviewed the current infractions, considered appellant's work record, and chose not to modify the recommended penalty of termination.

This court exercises a limited role in reviewing Commission sanction decisions. Stallworth, supra, 208 N.J. at 194. This court may reverse the agency's decision only if it was "arbitrary,

16                                                    A-4150-14T4

capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole." Ibid. (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). In particular, this court may not substitute its judgment for that of the Commission in determining whether a particular sanction is warranted. Id. at 194-95. This court may intervene only if the punishment "is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness." Id. at 195 (quoting In re Carter, supra, 191 N.J. at 484). We conclude it does not.

In light of this authority, the sanction is neither illegal nor unreasonable. We discern no basis to interfere with the propriety of the issued sanction.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-4150-14T4